IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED BY _____ D.C.

05 JUL 26 PM 1: 25

THOMAS M. GOULD
CLERK, U.S. DISTRICT COURT
W/D OF TN, MEMPHIS

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | X |
| Plaintiff, | X |
| vs. | X   Cv. No. 04-2642-Ml/P |
|  | X   Cr. No. 01-20024-Ml |
| MICHAEL NEWBORN, | X |
| Defendant. | X |

ORDER CORRECTING THE DOCKET
ORDER DENYING MOTION PURSUANT TO 28 U.S.C. § 2255
ORDER DENYING CERTIFICATE OF APPEALABILITY
AND
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH

Defendant Michael Newborn, Bureau of Prisons inmate registration number 17610-076, an inmate at the Federal Correctional Institution in Forrest City, Arkansas,[1] filed a *pro se* motion pursuant to 28 U.S.C. § 2255 on August 18, 2004, accompanied by a legal memorandum.

On February 13, 2001, a federal grand jury returned a five-count indictment against Newborn. The first count charged that Newborn, beginning sometime on or about 1992 and continuing up to and including January 17, 2001, conspired with Jerry Collier and Leroy Mallory and with other persons to possess Dilaudid (hydromorphone) with the intent to distribute and to distribute Dilaudid

---

[1] In order to facilitate the delivery of the Defendant's mail, the Clerk is ORDERED to correct the docket to include the Defendant's inmate registration number in his mailing address.

This document entered on the docket sheet in compliance
with Rule 58 and/or 79(a) FRCP on 7-27-05

(3)

(hydromorphone), in violation of 21 U.S.C. § 846. The second count charged that, on or about September 27, 2000, Newborn, aided and abetted by Leroy Mallory, possessed approximately five hundred (500) dosage units of Dilaudid (hydromorphone) with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The third count charged that, on or about November 21, 2000, Newborn possessed approximately two hundred (200) dosage units of Dilaudid (hydromorphone) with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1). The fourth count charged that, on or about December 7, 2000, Newborn possessed approximately two hundred (200) dosage units of Dilaudid (hydromorphone) with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1). The fifth count charged that, on or about January 17, 2001, Newborn possessed approximately five hundred (500) dosage units of Dilaudid (hydromorphone) with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1).

On May 2, 2001, pursuant to a written plea agreement, Newborn appeared before this Court to plead guilty to counts two, three, four, and five of the indictment. The Court conducted a sentencing hearing on August 2 and 3, 2001, at which time Newborn was sentenced to concurrent terms of imprisonment of twenty (20) years on counts 2, 3, and 4 and a consecutive term of six (6) years on count 5, for a total term of incarceration of twenty-six (26) years, to be followed by a five-year period of supervised release.[2] Judgment was

---

[2] Based on the statement of Leroy Mallory, and giving Newborn the benefit of the doubt, the drug quantity was calculated at 5000 pills per month from January 1998 through April 2000, plus the 1600 pills alleged in the indictment, resulting in a total of 141,600 Dilaudid pills. Converting the Dilaudid to its marijuana
(continued...)

entered on August 6, 2001. The United States Court of Appeals for the Sixth Circuit affirmed Newborn's sentence. United States v. Newborn, 71 Fed. Appx. 557 (6th Cir. Aug. 8, 2003), cert. denied, 540 U.S. 1135 (2004).

Newborn has now filed a motion pursuant to 28 U.S.C. § 2255 in which he raised the following issues:

1. He received ineffective assistance of counsel, in violation of the Sixth Amendment;

2. His sentence, which was based on a drug quantity that was not charged in the indictment, was imposed in violation of 18 U.S.C. § 3742(a)(1)-(3) and Blakely v. Washington, 124 S. Ct. 2531 (2004); and

3. The four-point enhancement as an organizer or leader violates Blakely.

The Court will address the second and third issues raised by Newborn before turning to the first issue.

Newborn raised portions of his second argument, that the drug quantity was calculated based on the uncorroborated testimony of co-conspirators, at the sentencing hearing, where the Court heard tape recordings of the transactions listed in the indictment and the testimony of Jerry Collier, a former Dilaudid dealer who became a confidential informant for the FBI, and Mallory. At the conclusion of the sentencing hearing, the Court credited the testimony of Collier and Mallory and adopted the presentence report's factual finding that

---

[2] (...continued) equivalent resulted in 31,860 kilograms of marijuana. Pursuant to § 2D1.1(c)(1) of the United States Sentencing Guidelines ("U.S.S.G"), the base offense level for 30,000 or more kilograms of marijuana is 38. Newborn received a four-point enhancement, pursuant to U.S.S.G. § 3B1.1(a), as the organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, resulting in an adjusted offense level of 42. Newborn received a three-point reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, resulting in a total offense level of 39. Given Newborn's criminal history category of I, the guidelines called for a sentencing range from 262 to 327 months.

Newborn's relevant conduct involved more than 141,600 Dilaudid tablets. Newborn raised the issue on direct appeal, where the Sixth Circuit affirmed the Court's determination of the drug quantity:

> Defendant argues that the district court erred in estimating the quantity of Dilaudid attributable to him because the estimate was based on speculation and unreliable testimony. Defendant argues that the testimony of Collier and Mallory was unreliable since their testimony indicated that they used drugs extensively during relevant time periods and, as a result, did not remember the exact quantities of Dilaudid they obtained from Defendant nor the exact dates on which they obtained the quantities of Dilaudid.
>
> We hold that the district court did not err in estimating the quantity of Dilaudid attributed to Defendant. See United States v. Owusu, 199 F.3d 329 (6th Cir. 2000). In Owusu, we held that the district court did not err in estimating the quantity of crack cocaine attributable to the defendant since the estimate was supported by competent evidence on the record. Id. at 338. Based solely on the testimony of a co-conspirator, the district court in Owusu estimated that 195 grams of crack cocaine was attributable to the defendant. Id. at 339. The co-conspirator testified that the defendant sold two ounces of crack cocaine to a crack house several times between 1988 and 1989. Id. The co-conspirator also testified that the defendant sold him one ounce of crack cocaine "every week or so" for two to three months in 1993. Id. On appeal, we stated that we will defer to the district court's credibility determination unless it has no foundation. Id. We reasoned that the district court's determination that the co-conspirator's testimony was credible was not without foundation because his testimony was consistent with other testimony on the record and because he had no reason to single the defendant out for the transactions. Id. We therefore concluded that the district court "properly erred on the side of caution" and included two ounces of crack cocaine, 56.7 grams, in the total attributed amount of 195 grams. Id.
>
> Like the co-conspirator in Owusu, Collier and Malloy estimated the dates of the transactions and the quantities involved therein. For instance, Collier testified that he and his brother each began purchasing approximately 400 to 600 Dilaudid tablets per week in 1991 or 1992 from Defendant. This continued until 1994 or 1995 at which time Collier and his brother each began purchasing approximately 5,000 Dilaudid tablets per month from Defendant. This continued until June or July of 1999. Thereafter, Collier purchased approximately 2,000 to 4,000 Dilaudid tablets per

4

month from Defendant until his arrest in April of 2000. After his arrest, Collier, as a confidential informant, purchased approximately 1,400 Dilaudid tablets from Defendant. The tape recordings corroborated Collier's testimony regarding the 1,400 Dilaudid tablets he purchased as a confidential informant.

Mallory testified that he began delivering approximately 100 Dilaudid tablets at a time for Defendant in 1997. This continued until the end of 1997 or the beginning of 1998 at which time Mallory began making deliveries for Defendant to the Colliers. Mallory delivered approximately 5,000 Dilaudid tablets every four to six weeks to Collier's brother until early 1999, and to Collier until April of 2000. In addition to delivering to the Colliers, Mallory delivered approximately 200 Dilaudid tablets per week to various other buyers for Defendant from 1998 to April of 2000. After Collier's arrest, Mallory delivered approximately 700 Dilaudid tablets to Collier for Defendant. In total, Mallory delivered approximately 150,000 Dilaudid tablets for Defendant. The tape recordings corroborated Mallory's testimony regarding 700 Dilaudid tablets he delivered to Collier for Defendant in September of 2000.

We find that the district court's determination that the testimony of Collier and Malloy was credible is not without foundation because their testimony was consistent and partially corroborated by the tape recordings. See id.; United States v. Baro, 15 F.3d 563, 569 (6th Cir. 1994) (stating that evidence of drug quantity "must have a minimal level of reliability beyond mere allegation") (internal quotations and citations omitted). Although Collier and Mallory did not remember the exact dates of the transactions or the exact quantities involved, their testimony indicated that Defendant likely sold more than 141,600 Dilaudid tablets over a lengthy period of time. See United States v. Walton, 908 F.2d 1289, 1302 (6th Cir. 1990) (holding that a district court may hold a defendant accountable for an estimated quantity of drugs where the defendant is more likely than not responsible for a quantity greater than or equal to that quantity). We therefore conclude that the district court properly estimated that 141,600 Dilaudid tablets were attributable to Defendant, which converts to a marijuana equivalency of 31,860 kilograms, resulting in a base offense level of 38. See USSG § 2D1.1(c)(1).

United States v. Newborn, 71 Fed. Appx. at 562-63.

"[A] § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law."

5

Jones v. United States, 178 F.3d 790, 796 (6th Cir. 1999); see DuPont v. United States, 76 F.3d 108, 110 (6th Cir. 1996). In this case, Newborn presumably contends that the Supreme Court's decision in Blakely v. Washington, 124 S. Ct. 2531 (2004), constitutes an extraordinary circumstance justifying reconsideration of this issue. The Court, however, finds Defendant's contention unpersuasive.

Newborn's claim that his sentence violates Blakely v. Washington was not available to him during his direct appeal. In a subsequent decision issued since this motion was filed, which Newborn has not cited but which the Court will consider sua sponte, the Supreme Court held that the mandatory aspects of the sentencing guidelines are unconstitutional. United States v. Booker, 125 S. Ct. 758 (2005). "As a general rule, new constitutional decisions are not applied retroactively to cases that were finalized prior to a new Supreme Court decision." Goode v. United States, 305 F.3d 378, 383 (6th Cir. 2002); see Schriro v. Summerlin, 124 S. Ct. 2519, 2522-26 (2004) (holding that decision in Ring v. Arizona, which held that a sentencing judge in a capital case may not find an aggravating factor necessary for imposition of the death penalty, and that the Sixth Amendment requires that those circumstances be found by a jury, does not apply retroactively to cases on collateral review); Teague v. Lane, 489 U.S. 288 (1989). Applying these standards, the Sixth Circuit has held that Blakely and Booker issues cannot be raised in an initial motion pursuant to 28 U.S.C. § 2255. Humphress v. United States, 398 F.3d 855, 860-63 (6th Cir. 2005).

For all of the foregoing reasons, Newborn's second claim is without merit and is DISMISSED.

6

Newborn raised portions of his third argument, concerning the appropriateness of the four-point enhancement for being an organizer and leader, at his sentencing hearing. At the conclusion of that hearing, the Court concluded, on the basis of the tape recordings and the testimony of the witnesses, that Newborn was an organizer and leader of criminal activity involving five or more participants. Newborn also raised the issue on direct appeal, where the Sixth Circuit affirmed his sentence:

> The district court held that a four-point enhancement under § 3B1.1(a) was warranted because the tape recordings and the testimony of Collier and Mallory supported the government's contention that Defendant was the organizer and leader of criminal activity involving five or more participants. The district court reasoned that the evidence demonstrated that (1) Defendant obtained large quantities of Dilaudid from a New York supplier pursuant to a credit arrangement; (2) Defendant sold Dilaudid to the Colliers and various other buyers; (3) Defendant supervised Mallory by instructing him to deliver specific quantities of Dilaudid to the Colliers and various other buyers; (4) Defendant collected money owed for the Dilaudid; and (5) Defendant paid money to the New York supplier.
>
> Although Defendant does not dispute that the criminal activity involved five or more participants, Defendant argues that the four-point enhancement under § 3B1.1(a) was not warranted because the evidence indicated that he was not the organizer or leader of the criminal activity.
>
> In <u>United States v. Vandeberg</u>, 201 F.3d 805, 811 (6th Cir. 2000), we stated that in determining whether a defendant qualifies as an organizer or leader under § 3B1.1, the district court should consider whether the defendant exercised decision-making authority, recruited accomplices, claimed a right to a larger share of the fruits of the crime, took a leadership role in planning the details of the offense, and exercised a significant degree of authority or control over other criminal participants. In <u>Vandeberg</u>, two co-defendants conspired to transport stolen property interstate. Despite the government's acquiescence in the defendant's position that he was not the organizer or leader of the conspiracy, the district court applied a two-point enhancement to the defendant's base offense level under § 3B1.1(c), without articulating a factual basis. <u>Id.</u> On appeal, we held that the district court erred in applying

7

the two-point enhancement because the defendant neither exercised decision-making authority, recruited the co-defendant, claimed a right to a larger share of the fruits of the conspiracy, took a leadership role in planning the details of the conspiracy, nor exercised any degree of authority or control over the co-defendant. Id.

Vandeberg is factually distinguishable from the facts at bar. Unlike the defendant in Vandeberg, Defendant exercised decision-making authority as to whom he sold Dilaudid and as to the price for which he sold it; he claimed a right to a larger share of the fruits of the crime inasmuch as he took profits from the Dilaudid he purchased from the New York supplier and later sold to the Colliers and various other buyers; he took a leadership role in planning the details of the offense by organizing and scheduling the transactions; and he exercised a significant degree of control over Mallory by paying him for delivering Dilaudid to the Colliers and various other buyers.

We hold that Defendant was the organizer and leader of the criminal activity. See United States v. Castro, 908 F.2d 85, 90 (6th Cir. 1990) (holding that the defendants qualified as organizers and leaders under § 3B1.1(a) because testimony at trial indicated that the defendants instructed co-conspirators to transport cocaine interstate, and that the defendants employed others to travel in cars equipped with secret compartments to transport cocaine and cash proceeds from the sale of cocaine interstate); United States v. Feinman, 930 F.2d 495, 500 (6th Cir. 1991) (holding that the defendant qualified as an organizer and leader under § 3B1.1(a) because testimony at trial indicated that the defendant recruited a co-conspirator to transport marijuana between California and Ohio, and that the defendant made arrangements with marijuana suppliers in California for the distribution of marijuana in Akron, Ohio); United States v. Hernandez, 227 F.3d 686, 700 (6th Cir. 2000) (holding that the defendant qualified as an organizer and leader under § 3B1.1(a) because the defendant instructed co-conspirators to make payments, took profits from transactions, paid a co-conspirator's utilities, and was involved in planning and organizing the marijuana conspiracy). We therefore conclude that the district court did not err in holding that the four-point enhancement under § 3B1.1(a) was warranted.

United States v. Newborn, 71 Fed. Appx. at 560-62.

As previously stated, Newborn cannot relitigate this issue, which was already decided on direct appeal, in the absence of extraordinary circumstances, and the Supreme Court's decisions in

8

Blakely and Booker do not constitute extraordinary circumstances because those decisions are not available to defendants filing initial § 2255 motions. Accordingly, this issue is without merit and is DISMISSED.

Finally, Newborn argues that his attorney rendered ineffective assistance, in violation of the Sixth Amendment, by failing to challenge the drug quantity determination contained in the presentence report. A claim that ineffective assistance of counsel has deprived a defendant of his Sixth Amendment right to counsel is controlled by the standards enunciated in Strickland v. Washington, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the Defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

In order to demonstrate deficient performance by counsel, a defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness." Id. at 688.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged

9

> conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Id. at 689 (citation omitted); see also Coe v. Bell, 161 F.3d 320, 342 (6th Cir. 1999) ("The specifics of what Coe claims an effective lawyer would have done for him are too voluminous to detail here. They also largely miss the point: just as (or more) important as what the lawyer missed is what he did not miss. That is, we focus on the adequacy or inadequacy of counsel's actual performance, not counsel's (hindsight) potential for improvement."); Adams v. Jago, 703 F.2d 978, 981 (6th Cir. 1983) ("a defendant 'has not been denied effective assistance by erroneous tactical decisions if, at the time, the decisions would have seemed reasonable to the competent trial attorney'").

A prisoner attacking his conviction bears the burden of establishing that he suffered some prejudice from his attorney's ineffectiveness. Lewis v. Alexander, 11 F.3d 1349, 1352 (6th Cir. 1993); Isabel v. United States, 980 F.2d 60, 64 (1st Cir. 1992). "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." Strickland, 466 U.S. at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. Id. at 697.

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

10

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Additionally, however, in analyzing prejudice,

> the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of the challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.

Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (citing United States v. Cronic, 466 U.S. 648, 658 (1984)); see also Strickland, 466 U.S. at 686 ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."). "Thus analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." Lockhart, 506 U.S. at 369. Where, as here, a defendant contends that he received ineffective assistance of counsel in connection with his sentencing, the Supreme Court has held that any increase in a defendant's sentence constitutes prejudice within the meaning of Strickland. Glover v. United States, 531 U.S. at 202-04.

Newborn's ineffective assistance claim is without merit for several reasons. First, Newborn cannot credibly claim to be surprised by the fact that the relevant conduct, for sentencing purposes, was not limited to the 1400 Dilaudid tablets that are the subjects of counts 2-5 of the indictment. Paragraph 1 of the Plea Agreement provides, in pertinent part, that "[t]he defendant understands that

11

the dismissal of count 1 will not effect the relevant conduct used in calculating the sentencing guidelines."

Second, Newborn cannot establish that the performance of his attorney was deficient. Trial counsel objected to the drug quantity determination contained in the presentence report and, as a result of that objection, the Court heard the testimony of witnesses at the sentencing hearing. Newborn does not indicate what his attorney should have said or done at the sentencing hearing to challenge the drug quantity calculation contained in the presentence report, and he does not attempt to demonstrate that, if only counsel had made those arguments, there is a reasonable probability that he would have received a lighter sentence. Finally, the fact that the Sixth Circuit upheld the drug quantity determination as supported by the evidence in the record, despite the objections of trial and appellate counsel, suggests that Newborn cannot satisfy his burden of demonstrating prejudice. For all the foregoing reasons, this issue is without merit and it is DISMISSED.

The motion, together with the files and record in this case "conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255; see also Rule 4(b), Rules Governing Section 2255 Motions in the United States District Courts. Therefore, the Court finds that a response is not required from the United States Attorney and that the motion may be resolved without an evidentiary hearing. United States v. Johnson, 327 U.S. 106, 111 (1946); Baker v. United States, 781 F.2d 85, 92 (6th Cir. 1986). Defendant's conviction and sentence are valid and therefore, his motion is DENIED.

12

Consideration must also be given to issues that may occur if the Defendant files a notice of appeal. Twenty-eight U.S.C. § 2253(a) requires the district court to evaluate the appealability of its decision denying a § 2255 motion and to issue a certificate of appealability ("COA") only if "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see also Fed. R. App. P. 22(b); Lyons v. Ohio Adult Parole Auth., 105 F.3d 1063, 1073 (6th Cir. 1997) (district judges may issue certificates of appealability under the AEDPA). No § 2255 movant may appeal without this certificate.

In Slack v. McDaniel, 529 U.S. 473, 483-84 (2000), the Supreme Court stated that § 2253 is a codification of the standard announced in Barefoot v. Estelle, 463 U.S. 880, 893 (1983), which requires a showing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "'adequate to deserve encouragement to proceed further.'" Slack, 529 U.S. at 484 (quoting Barefoot, 463 U.S. at 893 & n.4).

The Supreme Court recently cautioned against undue limitations on the issuance of certificates of appealability:

> [O]ur opinion in Slack held that a COA does not require a showing that the appeal will succeed. Accordingly, a court of appeals should not decline the application of a COA merely because it believes the applicant will not demonstrate an entitlement to relief. The holding in Slack would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail. It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief. After all, when a COA is sought, the whole premise is that the prisoner "'has already failed in that endeavor.'"

13

Miller-El v. Cockrell, 537 U.S. 322, 337 (2003) (quoting Barefoot, 463 U.S. at 893). Thus,

> [a] prisoner seeking a COA must prove "'something more than the absence of frivolity'" or the existence of mere "good faith" on his or her part. . . . We do not require petitioners to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail.

Id. at 338 (quoting Barefoot, 463 U.S. at 893); see also id. at 342 (cautioning courts against conflating their analysis of the merits with the decision of whether to issue a COA; "The question is the debatability of the underlying constitutional claim, not the resolution of that debate.").[3]

In this case, for the reasons previously stated, the Defendant's claims are lacking in substantive merit and, therefore, he cannot present a question of some substance about which reasonable jurists could differ. The Court therefore DENIES a certificate of appealability.

The Prison Litigation Reform Act of 1995 ("PLRA"), 28 U.S.C. § 1915(a)(3), does not apply to appeals of orders denying § 2255 motions. Hereford v. United States, 117 F.3d 949, 951 (6th Cir. 1997); cf. McGore v. Wrigglesworth, 114 F.3d 601, 610 (6th Cir. 1997) (instructing courts regarding proper PLRA procedures in prisoner civil-rights cases). Rather, to seek leave to appeal in forma pauperis in a § 2255 case, and thereby avoid the $255 filing fee required by

---

[3] By the same token, the Supreme Court also emphasized that "[o]ur holding should not be misconstrued as directing that a COA always must issue." Id. at 337. Instead, the COA requirement implements a system of "differential treatment of those appeals deserving of attention from those that plainly do not." Id.

28 U.S.C. §§ 1913 and 1917,[4] the prisoner must seek permission from the district court under Rule 24(a) of the Federal Rules of Appellate Procedure. Hereford, 117 F.3d at 952. If the motion is denied, the prisoner may renew the motion in the appellate court.

Rule 24(a)(1) provides that:

> Except as stated in Rule 24(a)(3), a party to a district-court action who desires to appeal in forma pauperis must file a motion in the district court. The party must attach an affidavit that:
>
>> (A) shows in the detail prescribed by Form 4 of the Appendix of Forms the party's inability to pay or to give security for fees and costs;
>>
>> (B) claims an entitlement to redress; and
>>
>> (C) states the issues that the party intends to present on appeal.

Fed. R. App. P. 24(a)(1). The Rule further requires the district court to certify in writing whether the appeal is taken in good faith. Fed. R. App. P. 24(a)(3)(A). For the same reasons the Court denies a certificate of appealability, the Court determines that any appeal in this case would not be taken in good faith. It is therefore CERTIFIED, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter by this Defendant is not taken in good faith, and he may not proceed on appeal in forma pauperis.

---

[4] Effective November 1, 2003, the fee for docketing an appeal is $250. See Judicial Conference Schedule of Fees, ¶ 1, Note following 28 U.S.C. § 1913. Under 28 U.S.C. § 1917, a district court also charges a $5 fee:

> Upon the filing of any separate or joint notice of appeal or application for appeal or upon the receipt of any order allowing, or notice of the allowance of, an appeal or of a writ of certiorari $5 shall be paid to the clerk of the district court, by the appellant or petitioner.

15

IT IS SO ORDERED this \_\_26\_\_ day of July, 2005.

_/s/ Jon P. McCalla_
JON PHIPPS McCALLA
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 3 in case 2:04-CV-02642 was distributed by fax, mail, or direct printing on July 27, 2005 to the parties listed.

---

Michael Newborn
FCI-FORREST CITY
P.O. Box 7000
Forrest City, AR 72335

Stuart J. Canale
U.S. ATTORNEY'S OFFICE
167 N. Main St.
Ste. 800
Memphis, TN 38103

Honorable Jon McCalla
US DISTRICT COURT